**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Raymond PORTER, Individually and d/b/a Porter Livestock Products; Farmers and Merchants Savings Bank; Iowa Department of Revenue; and John Russell Porter, Defendants.**

No. 4:05–cv–00464–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 4, 2008.

Joan Stentiford Ulmer, Laquita Taylor–Phillips, U.S. Department of Justice, Washington, DC, for Plaintiff.

Jonathan F. Altman, The Altman Law Firm LLC, Malvern, PA, R. Todd Gaffney, Finley Alt Smith Scharnberg Craig Hilmes & Gaffney PC, William E. Robak, Robak Law Firm PC, Des Moines, IA, for Raymond Porter, John Russell Porter.

Hubert J. Pries, Steven J. Havercamp, Stanley, Lande & Hunter, Davenport, IA, for Farmers and Merchants Savings Bank.

Valencia V. McCown, AAG, Des Moines, IA, for Iowa Department of Revenue.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter is before the Court on the Government's Motion for Summary Judgment, which Defendant Raymond Porter (Defendant) has resisted, and Defendant's Motion to Dismiss, Defendant's Notice of Objection to Failure to Include an Essential Party, Defendant's Demand for Jury Trial, and Defendant's Motion for Judgment on the Pleadings. The Government has resisted each of these motions. Neither party has requested a hearing, and the Court concludes a hearing on the pending motions is not necessary. The matters are now fully submitted for review.

## SUMMARY OF MATERIAL FACTS

Defendant operated Porter Livestock Products Company (Porter Livestock) from approximately 1982 until 1998 or 1999; Raymond Porter's son, John Russell Porter, continued the business thereafter. Porter Livestock was in the business of the manufacture and sale of nutritional products for swine and dairy and beef cattle, selling such nutritional products as Dairy Aid, Belly Buster, Iron Vite, and Culture Pac. During 1996 and 1997, the employment tax years at issue, Porter Livestock employed salesmen who sold Porter Livestock's products. The parties agree that James DenBoer (DenBoer), David Willard (Willard), Chad Mattes (Mattes), Thomas Brugman (Brugman), Donald Klostermann (Klostermann), Christopher Gottman (Gottman), and John Blickhan (Blickhan) were Porter Livestock's salesmen during the relevant time period. For tax reporting purposes, Defendant treated these salesmen as "independent contractors;" however, the Government asserts they were "employees." The distinction is important because Port-

er Livestock would be responsible for withholding and remitting employment and unemployment taxes for those deemed "employees" but not those deemed "independent contractors."

IRS Agent Carolyn Hingst (Agent Hingst) began an audit of Defendant's taxes in 1997, including Porter Livestock's 1996 and 1997 federal employment taxes. Based upon the IRS's conclusion that the salesmen were in fact employees, and not independent contractors, on May 8, 2000, additional federal employment and unemployment taxes and interest against Defendant, doing business as Porter Livestock, were assessed. The IRS also audited Defendant and Letha Porter's personal income taxes for tax years 1994 through 1997 and on February 14, 2000, assessed additional federal income taxes and interest against Defendant and Letha Porter.[1] The additional assessed taxes were not remitted by the Porters for either the employment or income taxes. Due to the nonpayment of these taxes, on May 14, 2001, a notice of federal tax lien was filed on the Porters' real property with the Recorder of Deeds for Muscatine County, Iowa.

On August 12, 2005, the Government filed a complaint alleging indebtedness for federal taxes (count one) and lien foreclosure (count two). The complaint listed Defendant, Farmers and Merchants Savings Bank, the Iowa Department of Revenue, and John Russell Porter as defendants.[2] The Government requests the Court (1) enter judgment in the amount of $276,714.36 against Defendant for un-

paid federal income tax with additional interest and additions accruing according to law after the dates assessed, (2) enter judgment against Defendant doing business as Porter Livestock products in the amount of $90,301.04 for unpaid federal employment and unemployment taxes with additional interest and additions accruing according to law after the dates of the assessment, (3) order foreclosure of the Government's tax liens upon certain real property owned by Defendant, and (4) determine the respective interests and claims of the other named defendants in the real property that is subject to the tax liens.

Defendant generally denies all of the allegations contained in the complaint and has set forth the affirmative defenses that (1) the tax liabilities at issue were correctly calculated, (2) tax returns were filed, and taxes due were paid, (3) the Government is taking an unreasonable position in this case, (4) some or all of the claims of the Government are barred by statutes of limitations, and (5) the complaint fails to state a claim upon which relief may be granted.

On November 1, 2006, the Government filed an amended complaint to correct an error in the street address and include the legal description for a third parcel of real property owned by the Porters. On November 7, 2006, the Government filed a Motion for Summary Judgment. The Government contends the federal income tax assessments made against Defendant and Letha Porter for the 1994 through 1997 years should be reduced to judgment, and

1. Letha Porter, who is now deceased, was Defendant's wife.

2. The Government states it included Farmers and Merchants Savings Bank, the Iowa Department of Revenue, and John Russell Porter as defendants in the event any of these parties had an interest in the real property on which

the liens had been placed. The parties have since agreed, in a stipulation approved by the Court on January 8, 2007, that if the real property described as "Parcel 1" is sold pursuant to any order of this Court, the sale shall be subject to Farmers and Merchants' first mortgage on Parcel 1.

the federal employment and unemployment taxes assessed against Defendant, individually and doing business as Porter Livestock, for the periods in 1996 and 1997 should be reduced to judgment. The Government asserts that as a result of the tax assessments, the Government has valid federal tax liens on certain parcels of real property belonging to the Porters. and the Government is entitled to foreclose its liens on these parcels.

Defendant resists the motion for summary judgment. Defendant argues genuine issues of material fact exist with respect to whether (1) there is a statute of limitations issue, (2) he is entitled to relief under Section 530 of the Revenue Act of 1978, (3) he had a reasonable basis for treating the salesmen as independent contractors, (4) innocent spouse relief was factored into the IRS's calculations, and (5) he received the requisite annual notice of tax delinquency and/or garnishments.

In June of 2007, Defendant's original counsel withdrew, and present counsel appeared, and as a result, additional filings were made prior to the resolution of the pending summary judgment motion. Defendant has filed a Motion to Dismiss, a Notice of Objection to Failure to Include an Essential and Necessary Party, a Demand for Jury Trial, and a Motion for Judgment on the Pleadings. The Government has resisted each of these motions.

## APPLICABLE LAW AND DISCUSSION

### I. Summary Judgment Standard

"[C]laims lacking merit may be dealt with through summary judgment under Rule 56." *Swierkiewicz v. Sorema,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Summary judgment is a drastic remedy, and the Eighth Circuit has recognized that it "must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1118 (8th Cir.2006) (quotation omitted). However, "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law," judgment should be rendered. Fed. R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.,* 462 F.3d 1015, 1018 (8th Cir.2006).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Heisler v. Metro. Council,* 339 F.3d 622, 631 (8th Cir.2003) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548). "If the moving party has carried its burden, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial." *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.,* 361 F.3d 465, 468 (8th Cir.2004). The Court gives the nonmoving party the benefit of all reasonable inferences and views the facts in the light most favorable to that party. *Liberty Mut. Fire Ins. Co. v. Scott,* 486 F.3d 418, 422 (8th Cir.2007); *de Llano v. Berglund,* 282 F.3d 1031, 1034 (8th Cir.2002).

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Hayek v. City of St. Paul,* 488 F.3d 1049, 1054 (8th Cir.2007) (citing *Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1006 (8th Cir. 2005)). Summary judgment should not be

granted if the Court can conclude that a reasonable trier of fact could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005) ("If a reasonable jury could return a verdict for the non-moving party based on the evidence presented, summary judgment is inappropriate."). In light of these standards, the Court considers the Government's summary judgment motion.

## II. The Government's Motion for Summary Judgment

### A. Statute of Limitations

■ Defendant contends an issue exists regarding whether the IRS properly obtained extensions of the statute of limitations so as to allow for the late assessment of the taxes at issue. The Government argues it properly obtained extensions, and all assessments were made in a timely manner.

With limited exceptions, tax assessments must occur within three years after the tax return for the particular tax period was filed. 26 U.S.C. § 6501(a).

> Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title ... both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

26 U.S.C. § 6501(c)(4)(A).

The Porters' 1040 tax return for 1994 was filed on April 15, 1995, thus the § 6501(a) assessment date for the 1994 taxes was April 15, 1998. The Porters'

1040 tax return for 1995 was filed on April 15, 1996; thus the § 6501(a) assessment date for the 1995 taxes was April 15, 1999. The Porters' 1040 tax return for 1996 was filed on April 15, 1997; thus the § 6501(a) assessment date for the 1996 taxes was April 15, 2000. The Porters' 1040 tax return for 1997 was filed on April 15, 1998; thus the § 6501(a) assessment date for the 1997 taxes was April 15, 2001.

On April 24, 1996, Letha Porter signed a General Power of Attorney, granting her husband the authority to act as her attorney-in-fact. On December 4, 1997, Defendant signed a consent to extend the time to assess tax with respect to the 1994 Form 1040 tax return, agreeing to an extension that allowed an assessment at any time on or before April 15, 1999. Defendant also signed the consent on Letha Porter's behalf in his capacity as her power of attorney. On January 12, 1999, Defendant signed a second consent to extend the time to assess tax with respect to the 1994 and 1995 Form 1040 tax returns, agreeing to an extension that allowed an assessment of those taxes at any time on or before April 15, 2000. Again, Defendant signed the consent on Letha Porter's behalf in his capacity as her power of attorney.

The Government has submitted a copy of a third consent to extend the time to assess tax with respect to the 1994, 1995, and 1996 Form 1040 tax returns, such extension granting until April 15, 2001, for the IRS to make an assessment. Unfortunately, the Government did not submit a copy of a signature page, thus there is no basis upon which the Court can conclude with certainty that Defendant signed this third consent and agreed to the extension. The Government relies on the following portion of Defendant's deposition testimony in support of its contention Defendant agreed to a third extension:

Q: Let me show you Deposition Exhibit 12, which is another consent to extend the time to assess. If you look at the back, is that your signature?

A: Yes.

Q: And you also signed it on behalf of your wife as power of attorney?

A: Yes.

Q: And your tax representative at that time signed it as well?

A: Uh-huh.

Def.'s App. 208, Dep. 154. This deposition testimony to which the Government cites in support of its assertion that the third extension was granted does not specifically indicate what tax years are at issue or what time frame the consent being referenced purported to address. In any event, the existence of this particular consent is irrelevant, as the Form 1040 taxes for 1994, 1995, 1996, and 1997 were all assessed on February 14, 2000, well within the second extension period for the 1994 and 1995 Form 1040 taxes and within the § 6501(a) deadline for the 1996 and 1997 taxes. The record reveals no statute of limitations issue with regard to the 1994, 1995, 1996, or 1997 Form 1040 tax returns.

Porter Livestock's employment tax Form 941 (pertaining to FICA[3] tax) for the first, second, third, and fourth quarters of 1996 were filed on April 30, 1996, July 31, 1996, October 31, 1996, and January 31, 1997, respectively. These quarterly returns were all filed before April 15 of 1997 and thus shall be considered as having been filed on April 15, 1997. *See* 26 U.S.C. § 6501(b)(2) ("For purposes of this section, if a return of tax imposed by chapter 3, 21 [FICA], or 24 for any period ending with or within a calendar year is filed before

April 15 of the succeeding calendar year, such return shall be considered filed on April 15 of such calendar year."). Porter Livestock's employment tax returns (Form 941) for the first, second, third, and fourth quarters of 1997 were filed on April 30, 1997, July 31, 1997, October 31, 1997, and January 31, 1998, respectively. These returns were filed before April 15 of 1998 and thus shall be considered as having been filed on April 15, 1998. *Id.* The § 6501(a) deadline for the 1996 employment tax assessment was April 15, 2000, and April 15, 2001, for the 1997 employment tax assessment.

The due date for filing unemployment tax Form 940 (pertaining to FUTA[4] tax) is January 31 of the year immediately following the pertinent tax year. *See* IRS Form 940. Porter Livestock's Form 940 for 1996 was filed on January 31, 1997. Porter Livestock's Form 940 for 1997 was filed on January 31, 1998. "For purposes of this section, a return of tax imposed by this title, except tax imposed by chapter 3, 21, or 24, filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day." 26 U.S.C. § 6501(b)(1). Thus, the § 6501(a) assessment date for the 1996 Form 940 taxes was January 31, 2000. The § 6501(a) assessment date for the 1997 Form 940 was January 31, 2001.

On August 13, 1999, Defendant signed a Form SS–10 consent to extend the time to assess employment taxes, extending the time to assess the tax year 1996 Form 940 taxes to April 15, 2001. Defendant signed a second Form SS–10 consent to extend the time to assess employment taxes with regard to the 1996 Form 940 and Form 941 taxes, which again permitted an exten-

---

**3.** Federal Insurance Contributions Act, 26 U.S.C. §§ 3101–3128.

**4.** Federal Unemployment Tax Act, 26 U.S.C. §§ 3301–3311.

sion to any time on or before April 15, 2001.[5] Defendant asserts this Form SS–10 was not signed by Letha Porter in any capacity, thereby raising additional statute of limitations issues.[6] There is no assertion in this case by Defendant that Letha Porter had any legal interest in Porter Livestock, and the second Form SS–10 pertained only to Porter Livestock's Form 940 and 941 taxes. Defendant has asserted no facts or evidence in the record to indicate why Letha Porter's signature would be required for a Form SS–10 pertaining solely to Porter Livestock's employment and unemployment taxes, and the Court concludes the lack of Letha Porter's signature on the second Form SS–10 does not render the document faulty. The assessments of additional Form 940 and Form 941 taxes were made on May 8, 2000, within the extension period. The additional employment and unemployment tax assessments for tax years 1996 and 1997 were therefore timely.

A review of the relevant statutes and the record evidence in this case leads to the conclusion that no statute of limitations issue exists with regard to the 1994, 1995, 1996, and 1997 Form 1040 tax assessments, or the 1996 and 1997 Form 940 and Form 941 tax assessments.

## B. Common Law Classification

Employers are required to withhold federal income tax from their employees' wages. 26 U.S.C. § 3102(1); *Jordan v. United States*, 490 F.3d 677, 679 (8th Cir. 2007).

Under the Internal Revenue Code, an employer is required to pay one-half of the total [Federal Insurance Contribution Act] taxes assessed against its employees, and withhold from paychecks those FICA taxes owed by the employees themselves. 26 U.S.C. §§ 3101, 3102(a), 3402(a). Also, the employer is obligated to pay [Federal Unemployment Tax Act] taxes for its employees. 26 U.S.C. § 3101 However, these obligations are incumbent upon an employer only if its workers are determined to be "employees" under the Tax Code.

*Boles Trucking, Inc. v. United States*, 77 F.3d 236, 238–39 (8th Cir.1996). The obligation to withhold these taxes, collectively referred to as "employment taxes," does not apply to those workers classified as "independent contractors." *Hosp. Res. Pers., Inc. v. United States*, 68 F.3d 421, 424 (11th Cir.1995) (recognizing that employers are only required to withhold and pay employment taxes in regard to "employees," and not to "independent contractors"); *see also Inst. for Res. Mgmt., Inc. v. United States*, 22 Cl.Ct. 114, 115 (1990) ("Employers are required to withhold and pay federal employment taxes in connection with payments made to employees, but not in connection with payments to independent contractors."); *Dahl v. Ameri–Life Health Serv. of Sara–Bay, L.L.C.*, No. 8:05–cv–66–T–17TBM, 2006 WL 2884962, at *5 (M.D.Fla. Oct. 10, 2006) ("Under federal tax laws, employers must withhold federal income tax from their employees wages, but not for payments made to independent contractors.").

Defendant argues Porter Livestock correctly classified its salesmen as independent contractors. Common law governs whether an individual is an "employee" or

---

**5.** Defendant's signature is dated 1999, although the exact month of the signature is illegible. The IRS representative's signature is dated November 10, 1999. This consent addressed both employment and unemployment taxes.

**6.** Counsel does not elaborate on the specific nature of these "additional statute of limitations issues."

an "independent contractor" for federal tax purposes. *Alford v. United States,* 116 F.3d 334, 336 (8th Cir.1997). "For purposes of [the Internal Revenue Code], the term 'employee' means ... any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2); *see also* 26 C.F.R. § 3121(d)–1(c)(1) ("Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.").

Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under

the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

26 C.F.R. § 3121(d)–1(c)(2). In Revenue Ruling 87–41, the IRS set forth twenty factors to consider when examining whether sufficient control existed to establish an employer-employee relationship, noting that these factors have been designed only as guides in making the determination.

1. INSTRUCTIONS. A worker who is required to comply with other persons' instructions about when, where, and how he or she is to work is ordinarily an employee. This control factor is present if the person or persons for whom the services are performed have the RIGHT to require compliance with instructions.

2. TRAINING. Training a worker by requiring an experienced employee to work with the worker, by corresponding with the worker, by requiring the worker to attend meetings, or by using other methods, indicates that the person or persons for whom the services are performed want the services performed in a particular method or manner.

3. INTEGRATION. Integration of the worker's services into the business operations generally shows that the worker is subject to direction and control. When the success or continuation of a business depends to an appreciable degree upon the performance of certain services, the workers who perform those services must necessarily be subject to a certain amount of control by the owner of the business.

4. SERVICES RENDERED PERSONALLY. If the Services must be

rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as in the results.

5. HIRING, SUPERVISING, AND PAYING ASSISTANTS. If the person or persons for whom the services are performed hire, supervise, and pay assistants, that factor generally shows control over the workers on the job. However, if one worker hires, supervises, and pays the other assistants pursuant to a contract under which the worker agrees to provide materials and labor and under which the worker is responsible only for the attainment of a result, this factor indicates an independent contractor status.

6. CONTINUING RELATIONSHIP. A continuing relationship between the worker and the person or persons for whom the services are performed indicates that an employer-employee relationship exists. A continuing relationship may exist where work is performed at frequently recurring although irregular intervals.

7. SET HOURS OF WORK. The establishment of set hours of work by the person or persons for whom the services are performed is a factor indicating control.

8. FULL TIME REQUIRED. If the worker must devote substantially full time to the business of the person or persons for whom the services are performed, such person or persons have control over the amount of time the worker spends working and impliedly restrict the worker from doing other gainful work. An independent contractor on the other hand, is free to work when and for whom he or she chooses.

9. DOING WORK ON EMPLOYER'S PREMISES. If the work is performed on the premises of the person or persons for whom the services are performed, that factor suggests control over the worker, especially if the work could be done elsewhere. Rev. Rul. 56–660, 1956–2 C.B. 693. Work done off the premises of the person or persons receiving the services, such as at the office of the worker, indicates some freedom from control. However, this fact by itself does not mean that the worker is not an employee. The importance of this factor depends on the nature of the service involved and the extent to which an employer generally would require that employees perform such services on the employer's premises. Control over the place of work is indicated when the person or persons for whom the services are performed have the right to compel the worker to travel a designated route, to canvass a territory within a certain time, or to work at specific places as required.

10. ORDER OR SEQUENCE SET. If a worker must perform services in the order or sequence set by the person or persons for whom the services are performed, that factor shows that the worker is not free to follow the worker's own pattern of work but must follow the established routines and schedules of the person or persons for whom the services are performed. Often, because of the nature of an occupation, the person or persons for whom the services are performed do not set the order of the services or set the order infrequently. It is sufficient to show control, however, if such person or persons retain the right to do so.

11. ORAL OR WRITTEN REPORTS. A requirement that the worker submit regular or written reports to the person or persons for whom the services are performed indicates a degree of control.

12. PAYMENT BY HOUR, WEEK, MONTH. Payment by the hour, week, or month generally points to an employer-employee relationship, provided that this method of payment is not just a convenient way of paying a lump sum agreed upon as the cost of a job. Payment made by the job or on straight commission generally indicates that the worker is an independent contractor.

13. PAYMENT OF BUSINESS AND/OR TRAVELING EXPENSES. If the person or persons for whom the services are performed ordinarily pay the worker's business and/or traveling expenses, the worker is ordinarily an employee. An employer, to be able to control expenses, generally retains the right to regulate and direct the worker's business activities.

14. FURNISHING OF TOOLS AND MATERIALS. The fact that the person or persons for whom the services are performed furnish significant tools, materials, and other equipment tends to show the existence of an employer-employee relationship.

15. SIGNIFICANT INVESTMENT. If the worker invests in facilities that are used by the worker in performing services and are not typically maintained by employees (such as the maintenance of an office rented at fair value from an unrelated party), that factor tends to indicate that the worker is an independent contractor. On the other hand, lack of investment in facilities indicates dependence on the person or persons for whom the services are performed for such facilities and, accordingly, the existence of an employer-employee relationship. See Rev. Rul. 71–524. Special scrutiny is required with respect to certain types of facilities, such as home offices.

16. REALIZATION OF PROFIT OR LOSS. A worker who can realize a profit or suffer a loss as a result of the worker's services (in addition to the profit or loss ordinarily realized by employees) is generally an independent contractor, but the worker who cannot is an employee. See Rev. Rul. 70–309. For example, if the worker is subject to a real risk of economic loss due to significant investments or a bona fide liability for expenses, such as salary payments to unrelated employees, that factor indicates that the worker is an independent contractor. The risk that a worker will not receive payment for his or her services, however, is common to both independent contractors and employees and thus does not constitute a sufficient economic risk to support treatment as an independent contractor.

17. WORKING FOR MORE THAN ONE FIRM AT A TIME. If a worker performs more than de minimis services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor. See Rev. Rul. 70–572, 1970–2 C.B. 221. However, a worker who performs services for more than one person may be an employee of each of the persons, especially where such persons are part of the same service arrangement.

18. MAKING SERVICE AVAILABLE TO GENERAL PUBLIC. The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.

19. RIGHT TO DISCHARGE. The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer. An employer exercises control through the threat of dismissal,

which causes the worker to obey the employer's instructions. An independent contractor, on the other hand, cannot be fired so long as the independent contractor produces a result that meets the contract specifications.

20. RIGHT TO TERMINATE. If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship.

Rev. Rul. 87–41, 1987–1 C.B. 296. "Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case." 26 C.F.R. § 3121(d)–1(c)(3). "The ultimate question of whether [the worker] is an employee or an independent contractor is one of law, and is answered by looking at the facts and applying the common law agency test." *Alford,* 116 F.3d at 336.

■ The Government asserts Porter Livestock set the ground rules for its salesmen, contending each salesman sold in a particular territory, and Porter Livestock required the salesmen to call on a certain number of customers each week. Defendant testified that salesmen were not assigned a set territory, and they could sell anywhere.

Q: So did you just say earlier your salesmen didn't have a territory?

A: No.

Q: You didn't say that or did they?

A: I said they didn't have, did not have.

Q: So they could sell anywhere?

A: Anywhere.

Q: But typically would they sell in the area where they lived?

A: Yes.

Q: Did anyone sell outside of the area where they lived?

A: Yes.

Q: Who did?

A: All of them. That's how we got scattered out to selling in seven states. They'd have relatives in another state.

Q: So if someone that didn't live near them wanted to purchase, they could go ahead and handle that sale with that customer?

A: Yes.

Q: No matter where the customer was located?

A: That's right.

Def.'s App. 184, Dep. 56–57. Defendant further testified the salesmen could work on their own time, they did not have to take orders from Porter Livestock, and they were not required to tell Defendant what they did on a day-to-day basis. The salesmen similarly testified that there were no set hours of work, they set their own work schedules, and no one else had control over when they worked. The establishment of set hours of work is a factor indicating control over the worker, whereas an independent contractor is free to work where, when, and for whom he chooses. The fact that the salesmen had no set territory in which to sell and were able to set their own work schedules in relation to their work for Porter Livestock weighs in favor of the independent contractor status.

The salesmen received most of their training in the form of Defendant providing advice or riding along with them on sales calls. DenBoer testified he received no training, and if he had any questions about the product he would just call Defendant and ask him. Blickhan testified he received training in the form of Defendant

making cold calls with him, Defendant providing "little classes at his motel room or in the lobby of the motel," and by simply calling Defendant for advice. Blickhan Dep. 15. Brugman testified he received training in the form of Defendant going out on the road with him to demonstrate the correct way to sell to the customer. Gottman testified he received training from Defendant in the form of Defendant going with him and teaching him about the products and how to present the products to the customer. Klostermann testified he attended a seminar that lasted approximately three days, and he received training in the form of learning about Porter Livestock's products and how to sell them. Klostermann also stated he received training on how to sell and how to close a sale. Willard testified he received training in the form of either Defendant or John Porter coming down and riding around with him, helping him deliver the products, and talking to him about new products. While there is no evidence to suggest the salesmen were required to attend any type of company meetings, it does appear each salesman received some form of training. Revenue Ruling 87–41 suggests the receipt of training indicates the employer wants the services performed by the worker in a particular method or manner, thereby demonstrating a level of control associated with an employer-employee relationship. It is fundamental, however, that even an independent contractor engaged in the business of sales would receive some level of training with regard to the business systems of a client and the client's product, while still being allowed to meet sales requirements in his or her own individual way. While recognizing the guidance provided by Revenue Ruling 87–41, given the precise employment at issue, sales, and the inherent necessity that a salesmen receive some form of training or information regarding the product he or she has been

tasked with selling, the Court concludes in this particular case, the fact that the salesmen received some training provides minimal guidance on the ultimate issue of whether they were misclassified as independent contractors, beyond a cumulative impression together with other factors.

The salesmen testified the work was typically done by making cold calls to potential customers from the salesman's home or driving around and talking with potential/current customers, thus the work was not performed on the premises of Porter Livestock. While work not performed on the premises ordinarily suggests a lack of control, this factor is afforded minimal weight because the nature of the services being rendered herein was essentially traveling sales.

There was apparently no requirement that the salesmen submit regular or written reports to Porter Livestock, although a few of the salesmen testified they did submit reports. Blickhan testified he turned in a sales report indicating what customers he called on. Mattes testified he prepared reports that he submitted to Porter Livestock that detailed the status of his inventory, how much he sold, what customer the product was sold to, and the date on which the sale took place. A requirement that a worker submit regular reports indicates a degree of control associated with an employer-employee relationship; however, the record in this case suggests the few salesmen who submitted reports to Porter Livestock did it voluntarily in the absence of a requirement for a written report.

The record indicates the salesmen were paid a draw on their commissions on a weekly basis. If the actual commissions for a particular salesman exceeded his monthly draw, he would receive additional compensation to reflect that additional amount he earned. If the actual commissions for a particular salesman fell below

his monthly draw, Porter Livestock would carry over that short amount on the books to the following month to allow the salesman an opportunity to make up the deficit through sales. While payment on a weekly basis generally indicates an employer-employee relationship, payment on straight commission suggests the worker is an independent contractor. Under the Porter Livestock pay structure, compensation was a combination of both. The salesmen were only entitled to compensation earned through commissions; however, Porter Livestock paid the salesmen an advance or "draw" on future commissions in the amount of approximately $500 on a weekly basis. Because the Porter Livestock compensation structure resembles that of both an independent contractor and that of an employee, this factor does not particularly weigh in favor of either employment classification.

The salesmen consistently testified they were reimbursed for their business expenses, such as copying fees, gas and hotel expenses, and advertising fees. The salesmen also testified Porter Livestock provided them with a vehicle to use while making sales calls and deliveries of product. The relevant factors contained in Revenue Ruling 87–41 indicate that if the employer pays for the worker's business expenses, the worker is ordinarily an employee. This factor weighs in favor of a finding of an employer-employee classification.

The record reflects the salesmen did not invest in facilities that were used in performing their work for Porter Livestock. In fact, Mattes testified he rented a storage unit in order to store the inventory of product he had on hand, and Porter Livestock reimbursed him for this expense. The lack of a significant investment in facilities is another factor that indicates the existence of an employer-employee relationship.

A few of the salesmen testified that while working for Porter Livestock, they also performed services for unrelated companies. DenBoer testified he worked for another feed company, taking care of the company's livestock. Brugman testified he worked on rebuilding houses during the same time period he was working for Porter Livestock, spending about equal amounts of time at each job. This factor generally indicates the worker is an independent contractor; however, because only two salesmen reported having additional employment, the factor is afforded minimal weight.

When questioned about the issue, salesmen testified they had the right to terminate their employment with Porter Livestock at any time, and that likewise, Porter Livestock could terminate the salesman's employment at any time. The right to discharge a worker indicates the worker is an employee, and an individual's right to end their own employment also indicates an employer-employee relationship.

Finally, the salesmen testified they were provided with no health benefits or other typical employee benefits.

Even viewing the facts in the light most favorable to Defendant, an examination of the facts in the record leads to the conclusion that a consideration of the relevant factors supports the IRS's finding that the salesmen were not properly classified as independent contractors, and, instead, an employer-employee relationship existed. This finding, however, does not end the inquiry or automatically lead to a grant of summary judgment in the Government's favor, due to the existence of the safe harbor of section 530 of the Revenue Act.

## C. Revenue Act of 1978 § 530 Relief

Section 530 of the Revenue Act serves as a safe harbor for those employers who

have misclassified their workers and thus failed to properly withhold employment taxes. "Section 530 was enacted by Congress to alleviate what was perceived as overly zealous pursuit and assessment of taxes and penalties against employers who had, in good faith, misclassified their employees as independent contractors." *Ahmed v. United States,* 147 F.3d 791, 796 (8th Cir.1998) (quoting *Boles Trucking, Inc.,* 77 F.3d at 239 (internal quotation marks omitted)).

By its very terms, section 530 is a relief provision available only to employers who erroneously classify their employees. Section 530 applies if (1) the taxpayer does not treat a worker as an employee for employment tax purpose during a particular period; (2) the taxpayer files all required federal employment tax returns on a basis consistent with this treatment; and (3) the taxpayer has a reasonable basis for not treating the worker as an employee.

*Id.* at 797 (citing *Springfield v. United States,* 88 F.3d 750, 753 (9th Cir.1996)). Section 530 is not codified but rather can be found as a note to 26 U.S.C. § 3401. Section 530 states as follows:

(a) Termination of certain employment tax liability—

(1) In general.—If—(A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and (B) in the case of periods after December 31, 1978, all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee, then for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee unless the taxpayer had no reasonable basis for not treating such individual as an employee.

(2) Statutory standards providing one method of satisfying the requirements of paragraph (1).—For purposes of paragraph (1), a taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in reasonable reliance on any of the following: (A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer; (B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or (C) long-standing recognized practice of a significant segment of the industry in which such individual was engaged.

(3) Consistency required in the case of prior tax treatment.—Paragraph (1) shall not apply with respect to the treatment of any individual for employment tax purposes for any period ending after December 31, 1978, if the taxpayer (or a predecessor) has treated any individual holding a substantially similar position as an employee for purposes of the employment taxes for any period beginning after December 31, 1977.

Section 530 is to be liberally construed in favor of the taxpayer. *Boles Trucking, Inc.,* 77 F.3d at 240; *see also Deja Vu–Lynnwood, Inc. v. United States,* 21 Fed. Appx. 691, 693 (9th Cir.2001) (unpublished mem.); *303 West 42nd St. Enters., Inc. v. I.R.S.,* 181 F.3d 272, 276 (2nd Cir.1999); *Springfield,* 88 F.3d at 753; *Greco v. United States,* 380 F.Supp.2d 598, 615 (M.D.Pa. 2005); *VTA Mgmt. Servs., Inc. v. United*

*States,* No. 01CV0145ARRVVP, 2004 WL 3199677, at \*9 (E.D.N.Y. Dec. 14, 2004).

> Section 530 has three essential requirements: First, the taxpayer must have filed requisite federal tax returns (including information returns) on a basis consistent with the tax payer's treatment of the individuals in question as independent contractors (the reporting consistency requirement); second, the taxpayer must have treated all persons holding substantially similar positions as independent contractors (the substantive consistency requirement); and third, the taxpayer must have had a reasonable basis for treating the individuals in question as independent contractors (the reasonable basis requirement).

*Greco,* 380 F.Supp.2d at 615.

■ Defendant argues a genuine issue of material fact exists regarding whether he is entitled to section 530 relief from employment tax liability. The Government asserts Defendant cannot invoke section 530 protection because he has failed to show Porter Livestock filed all the required forms with the IRS for the 1996 and 1997 tax years, and even if Defendant could meet the prerequisites to invoke section 530 protection, he cannot provide a reasonable basis for Porter Livestock not treating its salesmen as employees.[7]

First, the Court examines the reporting consistency requirement. "In connection with payments to 'independent contractors,' employers only have to send annual information returns, on Form 1099 to the workers and on Forms 1096 & 1099 to the IRS, indicating the income paid during the year." *Hosp. Res. Pers., Inc.,* 68 F.3d at 424; *see also* 26 U.S.C. § 1.6041–1(a)(1)(i); *Greco,* 380 F.Supp.2d at 613. The trea-

sury regulations only require employers to file Forms 1099 and 1096 where the "[s]alaries, wages, commissions fees, and other forms of compensation for services rendered aggregat[e] $600 or more." 26 C.F.R. § 1.6041–1(a)(1)(i)(A).

Internal Revenue Agent Jacquelyn Kessenich (Agent Kessenich) testified in her deposition that IRS records show Porter Livestock filed Form 1099s for 1997. Agent Kessenich specifically testified that these 1099s related to the compensation paid to the outside salesmen at issue, and she stated she found nothing in the IRS records to indicate Form 1099s were filed for 1996.

Defendant swore in a December 2006 affidavit that to the best of his knowledge and belief, 1099 tax forms were filed and mailed to all salesmen for all years that the salesmen sold for Porter Livestock, and he relied on his tax preparer to prepare, file, and mail all applicable tax forms.

Defendant has provided copies of Form 1099s that Defendant asserts Porter Livestock provided to its workers in 1996. The record contains copies of Form 1099s for 1996 for salesmen Gottman, Willard, Mattes, DenBoer, and Blickhan. The record also contains Form 1099s for salesmen Klostermann; however, because the copy provided to the Court is of poor quality, the year on the form is illegible and thus it remains unclear whether this Form 1099 pertains to 1996.

In addition to the Form 1099s for 1996 Defendant has provided, the record also contains Form 1099s for 1996 that were provided by the salesmen themselves. Brugman and DenBoer each provided copies of Form 1099s for 1996 they received

---

7. The Government also initially claimed Defendant failed to raise section 530 protection as a defense in his answer to the complaint; however, the defense was raised in Defen-

dant's December 4, 2006, answer to the amended complaint, rendering this argument from the Government moot.

from Porter Livestock. Brugman and Blickhan also provided copies of their 1996 income tax returns. Each tax return submitted by these salesmen included a Schedule C detailing profit or loss from business. Line one of Schedule C requires the taxpayer to report gross receipts or sales and includes the following caution: "If this income was reported to you on Form W–2 and the 'Statutory employee' box on that form was checked, see page C–2 and check [box] here." The box referenced was not checked on any of the Schedule Cs submitted by the salesmen. More notably, the amount Blickhan reported on line one of his 1996 Schedule C, $4,625.00, is identical to the amount identified as "non-employee compensation" on the 1996 Form 1099 Defendant asserts he provided to Blickhan. The amount Brugman reported on line one of his 1996 Schedule C, $17,019.00, is nearly identical to the amount identified as "non-employee compensation," $17,019.37, on the 1996 Form 1099 Brugman stated he received from Defendant.

DenBoer testified he was quite certain he received a Form 1099 from Porter Livestock for the years he worked there. Blickhan testified it was up to him to take the employment taxes out of his own wages and that he withheld the taxes and put them in a special savings account and paid the taxes quarterly. Gottman testified he believed the compensation he received from Porter Livestock was reported on a Form 1099 for the years he worked for the company; however, he was not 100 percent certain. Brugman testified his tax preparer provided a Form 1099 for 1996 from Porter Livestock that Brugman's tax preparer had retained in his file. Mattes testified he believed he received a Form

1099, because during the years he worked for Porter Livestock, he filed his income taxes as an independent contractor. Ultimately, Mattes could not remember if he received a Form 1099 or a W–2. The deposition testimony of Klostermann and Willard, submitted by the Government, does not address whether or not they received Form 1099s during their employment with Porter Livestock.

Agent Hingst testified during her deposition that during the course of her investigation in 1997, either Defendant or his power of attorney provided her with copies of Form 1099s for 1996. Agent Hingst testified that she could not recall if those 1996 Form 1099s were filed or not, and she did not actually check the IRS records during her 1997 investigation to determine if they had actually been filed. Agent Kessenich testified the IRS records indicated no Form 1099s were filed for 1996.

Defendant testified Form 1099s were provided to the salesmen as far as he knew, but ultimately the office manager, Dan Ruess, would have been responsible for handling the Form 1099s. Defendant testified that he was assured by Ruess that a Form 1099 was filed for any worker who earned any money on commission.[8]

Defendant has provided a copy of a Form 1096 for the 1996 employment taxes. Defendant has also provided a copy of a Form 1096 for the 1997 employment taxes. The Government has not addressed whether a Form 1096 was filed by Porter Livestock for 1996.

Agent Kessenich testified the IRS records indicate no Form 1099s were filed by Porter Livestock for 1996, while Agent Hingst testified she did not check whether the Form 1099s for 1996 had been filed.

---

8. The deposition testimony of Ruess that has been submitted does not address the filing or preparation of Form 1099s.

Defendant has provided copies of Form 1099s and Form 1096 for 1996, and the salesmen consistently testified that either they did in fact receive a Form 1099, or at the very least, they believed they did but could not recall for certain. Examining the evidence in the light most favorable to Defendant, it is unclear whether Form 1099s were filed for the salesmen for 1996 and whether Form 1096s were filed for either 1996 or 1997. The Court concludes a genuine issue of material fact exists in regard to the reporting consistency requirement necessary for section 530 relief.

Second, the Court must examine the substantive consistency requirement to determine whether Porter Livestock consistently treated the salesmen as independent contractors. There is no evidence in the record to indicate Porter Livestock classified the salesmen differently from one another for employment tax reporting purposes. The Government makes no argument with respect to whether Porter Livestock consistently treated the relevant workers as independent contractors and has provided no evidence to establish Porter Livestock referred to workers it classified as independent contractors as employees. The record fails to establish Porter Livestock did not consistently treat the salesmen as independent contractors. The Court therefore concludes summary judgment in the Government's favor is not appropriate as to the substantive consistency requirement of section 530 relief.

Third, the Court must examine the reasonable basis requirement. Defendant argues he has a reasonable basis for treating his salesman as independent contractors. The Government argues that even if Defendant could meet the prerequisites to invoke section 530 protection, he cannot provide a reasonable basis for Porter Livestock not treating its salesmen as employees. As indicated above,

[A] taxpayer shall in any case be treated as having a reasonable basis for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in reasonable reliance on any of the following: (A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer; (B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions substantially similar to the position held by this individual; or (C) longstanding recognized practice of a significant segment of the industry in which such individual was engaged.

Defendant asserts he relied on technical advice from Russell Newell (Newell) in the preparation of Porter Livestock's tax returns and for that reason should be treated as having a reasonable basis for treating the salesmen as independent contractors. Defendant testified that Newell was his long-time attorney who did all of his tax work, preparing all of his federal income tax returns for the years at issue in this suit. Defendant testified they would take their "checks and sales receipts and everything" to Newell's office on a monthly basis, and at the end of the year, Newell would tell them how much tax they owed. Def.'s App. 180, Dep. 38. "Advice of counsel and other professional advisors qualifies as technical advice." *VTA Mgmt. Servs., Inc.,* 2004 WL 3199677, at *13; *see also Select Rehab., Inc. v. United States,* 205 F.Supp.2d 376, 383 (M.D.Pa.2002) (holding taxpayer could satisfy the reasonable basis requirement by establishing it reasonably relied on the advice of counsel); *N. La. Rehab. Ctr., Inc. v. United States,* 179 F.Supp.2d 658, 669 (W.D.La.2001) (finding reliance on the advice of in-house and outside counsel suf-

ficient to establish a reasonable basis for treating the workers as independent contractors).

The Government points out there is no testimony on the record from Newell regarding any advice and assistance he allegedly gave Defendant with respect to the classification of Porter Livestock's salesmen as employees or independent contractors. Unfortunately, that is because Newell is deceased.

Other than the deposition testimony of Defendant, there is little evidence in the record regarding the nature of advice Newell provided to Porter Livestock with regard to whether the salesmen should be treated as independent contractors or employees. While it appears Defendant relied on the technical advice of Newell, given the unclear record regarding actual advice and reliance on any such advice from Newell, summary judgment on the reasonable basis requirement of section 530 relief is not appropriate.

The Court concludes that viewing the record in the light most favorable to Defendant as the nonmoving party, genuine issues of material fact exist regarding whether there was reporting consistency, substantive consistency, and whether a reasonable basis exists based on reliance on technical advice from Newell. For those reasons, summary judgment must be denied with respect to the Government's argument that Defendant is not entitled to section 530 relief.

### D. Innocent Spouse Relief

Defendant asserts Agent Hingst testified she was aware Letha Porter had been diagnosed with Alzheimer's disease and therefore Letha Porter would not have been aware of tax matters involving Porter Livestock. For that reason, Agent Hingst stated she was providing innocent spouse relief to Letha Porter. Defendant asserts none of the tax assessments provided in this case reflect an adjustment or reduction based on innocent spouse relief. Defendant claims an issue exists regarding whether innocent spouse relief was provided at all.

■ The Government maintains that whether Letha Porter was entitled to and granted innocent spouse relief is immaterial to the issues presented in this case, and even if she was entitled to such relief, Defendant has failed to show how her innocent spouse relief would affect the amount of the tax assessments at issue.

Under procedures prescribed by the Secretary, if—

(A) a joint return has been made for a taxable year;

(B) on such return there is an understatement of tax attributable to erroneous items of one individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

26 U.S.C. § 6015(b)(1). Innocent spouse relief merely relieves the innocent spouse, in this case, Letha Porter, of tax liability for tax returns which the innocent spouse signed without knowing misrepresentations were included in the tax returns which reduced the tax liability. Due to Letha Porter's death and the joint and several nature of tax liability for joint returns, it is irrelevant whether she was granted innocent spouse relief.

Defendant argues that any additional tax assessments against Porter Livestock affected the tax rights of Letha Porter, because "it is simple mathematics" that any increase in adjusted gross income resulted in a decrease of the allowed medical expenses of Letha Porter as claimed on the Schedule A itemized deductions. The Government responds by stating this does not create a dispute of fact, because any decrease in the amount of the allowed medical expenses reflected on Defendant and Letha Porter's Schedule A for the income tax years at issue was due to an increase to Defendant's adjusted gross income. The Government states that Defendant's adjusted gross income was increased as a result of the additional employment and unemployment tax assessments at issue, and thus any decrease in allowed medical expenses is justified.

Innocent spouse relief merely relieves the innocent spouse of liability for the taxes at issue; it does not provide the innocent spouse with any type of credit or other benefit that would result in a adjustment or reduction of the tax liability owed by the noninnocent spouse. The Court finds there is no genuine issue of material fact regarding innocent spouse relief.

### E. Annual Notice of Tax Delinquency

▆ Finally, Defendant claims he does not recall receiving an annual notice of tax delinquency statement for the tax periods in question. The Government asserts Defendant's contentions regarding the IRS's collection actions do not raise an issue regarding his liability for assessed taxes; rather, they amount to a claim under 26 U.S.C. § 7433 for wrongful collection.

> If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally, or by reason of negligence disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

26 U.S.C. § 7433(a). "A judgment for damages shall not be awarded ... unless the court determines that the [taxpayer] has exhausted the administrative remedies available to such [taxpayer] within the Internal Revenue Service." *Id.* § 7433(d)(1). "Before a taxpayer may recover under Section 7433, he must exhaust his administrative remedies." *Eastman v. United States,* No. 06–cv–1069, 2008 WL 899252, at *4 (W.D.Ark. Mar. 31, 2008); *see also Merfeld v. Holmes,* No. C03–2022, 2003 WL 23169796, at *2 (N.D.Iowa Oct. 29, 2003) (finding the court lacked subject matter jurisdiction over § 7433 claims because the taxpayer failed to exhaust his administrative remedies); *Piciulo v. Brown,* No. 4:05CV46, 2005 WL 1926688, at *4 (E.D.Mo. May 25, 2005) ("To sustain a cause of action under 26 U.S.C. § 7433, a plaintiff must first exhaust available administrative remedies."). Defendant has failed to demonstrate or even allege that administrative remedies have been exhausted; thus the Court cannot entertain any argument that is in essence a section 7433 claim.

Defendant also contends IRS Agent Mary Jo Ratchford (Agent Ratchford) testified during her deposition that garnishments of Defendant's bank account were carried out but that no letter or other written notice had been provided to Defendant to detail the amounts garnished; and there is no reduction shown on the amount of taxes due to reflect the funds garnished. In support of this assertion, Defendant cites to the following portion of Agent Ratchford's deposition testimony:

A:  ... taxpayer. The bank usually—I won't—I don't know for sure, but usually the bank notifies or they find out from the bank exactly how much. I don't usually tell them. No.

Q:  So you don't know if the IRS sends the taxpayer a letter on this issue?

A:  I'm not—

Q:  After—

A:  I don't send a letter stating how much I received.

Q:  Where do the funds go when they are levied?

A:  When I receive them?

Q:  Yes.

A.  I apply them to the tax periods on the levy.

Q:  But you don't send a letter to the taxpayer?

A:  As far as to the amounts?

Q:  Yes.

A:  No. Not unless requested.

Q:  You don't send a letter that notifies that this amount levied applied to tax, this is your tax balance due, that kind of—

A:  In general, no.

Q:  So generally, from your understanding, it's up to the taxpayer to find

out the number from the bank and go from there?

A:  Well, they can ask me also. If I issued the levy they could call and ask me how much and where it was applied.

Def.'s App. 64, Dep. 25–6. To assert that Agent Ratchford testified garnishments were indeed made on Defendant's account misrepresents this testimony. Clearly, Agent Ratchford was testifying in general about how she sends notice out when a levy takes place. Defendant has failed to provide any evidence to demonstrate a garnishment was made on his bank account and has failed to demonstrate the IRS's collection actions create a genuine issue of material fact.

The record demonstrates there is no genuine issue of material fact with respect to the statute of limitations for the tax years at issue, whether Defendant received annual notice of tax delinquency, or innocent spouse relief, and Defendant's arguments as to those issues are insufficient to defeat summary judgment as to the income taxes for 1994, 1995, 1996, and 1997. The record does reveal a genuine issue of material fact regarding whether Defendant is entitled to section 530 relief from the employment tax liability. For that reason, summary judgment as to the 1996 and 1997 employment taxes must be denied.

### III.  Defendant's Motion to Dismiss

On June 18, 2007, Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing the Government's motion for summary judgment was filed on the original complaint, not the amended complaint, and therefore the Government's motion for summary judgment is void and the Court lacks subject matter jurisdiction to consider the Government's motion for summary judgment. Defendant also argues the

Government's amended complaint is void on its face due to "severe procedural defects in the filing of the complaint and motion for summary judgment." The Government maintains Defendant has failed to articulate any reason why the amended complaint is improper, and the motion for summary judgment was timely filed.

The original complaint was filed on August 12, 2005. The amended complaint was filed on November 1, 2006. The amended complaint did not add any new claims or substantive allegations to the action. Instead, it merely corrected an error in the street address of the real property labeled as Parcel 2 in the complaint and included the legal description for a third parcel of property on which the Government is seeking to foreclose the tax liens. The Government's motion for summary judgment was then filed on November 7, 2006.

First, Defendant claims the Government filed its motion for summary judgment "on the original complaint," and that because the amended complaint voided the original complaint, the summary judgment motion is void on its face. The Government's summary judgment motion does not contain any specific reference to the "original" complaint. A review of the Government's motion for summary judgment shows the Government simply requests the Court grant summary judgment against Defendant, individually and doing business as Porter Livestock, and John Porter on the grounds that there are no genuine issues as to any material fact and to find that the Government is entitled to judgment as a matter of law.

Second, Defendant has not alleged any defects exist in the amended complaint. Instead, Defendant appears to be arguing that the Government's motion for summary judgment is void because it was filed before the expiration of the ten days permitted under Federal Rule of Civil Procedure 15(a) to respond to the amended complaint. Federal Rule of Civil Procedure 15(a)(3) provides, "Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 10 days after service of the amended pleading, whichever is later." Rule 15(a)(3) imposes no requirement that a responsive pleading to an amended pleading must be filed before a summary judgment motion can be filed; it merely indicates the time in which the responsive pleading must be filed. "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim. The motion may be filed at any time after . . . 20 days have passed from commencement of the action." Fed.R.Civ.P. 56(a)(1). "An amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2). The amended complaint arose out of the same conduct set forth in the original complaint. The amended complaint therefore relates back to the date the original complaint was filed, August 12, 2005. The Government's motion for summary judgment, filed on November 7, 2006, was well over the 20–day period set forth in Rule 56(a). The Court concludes Defendant's motion to dismiss must be denied.

## IV. Defendant's Notice of Objection to Government's Failure to Include an Essential and Necessary Party

Defendant claims Letha Porter, who is deceased, is an essential and necessary party in this case because the tax returns at issue were filed jointly. Defendant ob-

jects to the Government's failure to include Letha Porter as a party in this suit and has submitted a written objection "to establish and preserve the record." The Government argues this objection is without merit because Letha Porter is not a necessary party to this action.

■ The returns at issue in this case were filed by Defendant and Letha Porter as joint returns. "[I]f a joint return is made ... the liability with respect to the tax shall be joint and several." 26 U.S.C. § 6013(d)(3). The United States may sue one or both spouses to collect income tax from a joint return. *Tavery v. United States*, 897 F.2d 1032, 1034 (10th Cir.1990) (citing *Martin v. United States*, 411 F.2d 1164 (8th Cir.1969)); *In re Richmond*, 456 F.2d 458, 462–63 (3d Cir.1972). Because the liability for the taxes at issue is joint and several between Defendant and Letha Porter, Letha Porter is not a necessary party to this action. Defendant's objection to the Government's failure to name Letha Porter as a party to this suit is therefore overruled.

## V. Defendant's Demand for Jury Trial

On July 12, 2007, Defendant, for the first time, filed a demand for jury trial. Defendant contends he retained new counsel on June 4, 2007, and the newly obtained counsel discovered after reviewing the docket that no prior demand for a jury trial had been made.

The Government does not dispute Defendant had a right to a trial by jury in this case. The Government argues Defendant waited twenty months after filing the amended answer to request a jury trial, and consequently Defendant failed to make a timely demand for a jury trial and thus waived the right to one. The Government asserts that even if Defendant had requested a jury trial within ten days of the United States amending its complaint, the previously waived right would not have been revived because the amended complaint merely corrected an error in the street address for one of the properties described in the original complaint and included the legal description for another parcel of property, and the amendments did not raise any new triable issues. The Government argues Defendant has not offered any justifiable reason for not filing a jury demand within the required ten-day period and waiting for twenty months before filing one.

■ Rule 38(b) of the Federal Rules of Civil Procedure permits a party to demand a jury trial on any issue triable of right by jury. The demand must be made "no later than ten days after the service of the last pleading directed to such issue." Fed. R.Civ.P. 38(b)(1). "A party waives a jury trial unless its demand is properly served and filed." Fed.R.Civ.P. 38(d). An amended pleading that contains no new triable issues involving the party making the demand does not revive the right. *Shelton v. Consumer Prod. Safety Comm'n*, 277 F.3d 998, 1011–12 (8th Cir. 2002).

It is undisputed Defendant did not timely file a demand for a jury trial in accordance with Federal Rule of Civil Procedure 38(b). Where a jury trial is not properly demanded, the Court has the discretion, on its own motion, to "order a jury trial on any issue for which a jury might have been demanded." Fed.R.Civ.P. 39(b). Other than indicating there was a change in defense counsel in June 2007, Defendant has failed to offer any explanation why a demand for jury trial was not timely made, and Defendant has not indicated what prejudice would result from the denial of a jury trial. Under such circumstances, the Court will not exercise its discretion under Federal Rule of Civil Procedure 39(b) to order a jury trial on its

own motion. *See Shelton,* 277 F.3d at 1011 (affirming denial of jury trial where the parties offered no persuasive explanation for their failure to file a timely demand for a jury trial); *Littlefield v. Fort Dodge Messenger,* 614 F.2d 581, 585 (8th Cir. 1980) (affirming denial of belated request for a jury trial when the party offered "no justification for the failure to make an appropriate demand other than inexperience" and the party pointed to no prejudice resulting from the denial). The Court finds Defendant's demand for jury trial is untimely, fails to provide a basis for the exercise of this Court's discretion, and must be denied.

## VI. Defendant's Motion for Judgment on the Pleadings

Finally, Defendant has filed a Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c). Defendant argues he is entitled to a judgment on the pleadings because the Government (1) is asserting claims that are time-barred, (2) has failed to set forth evidence as to the steps taken to make assessments of the liability at issue, and the amended complaint does not establish the Government took the requisite steps to perfect an assessment of deficiency, (3) the liens at issue were not correctly obtained and executed, and (4) the inclusion of John Russell Porter as a party to this action is premature and therefore is in error.

The Government argues Defendant's motion is improper and raises meritless issues. The Government contends that because its opposition to Defendant's motion is supported by documents outside the pleadings, the Court should convert the motion into one for summary judgment.

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). "A grant of judgment on the pleadings is appropriate 'where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law.'" *Poehl v. Countrywide Home Loans, Inc.,* 528 F.3d 1093, 1096 (8th Cir.2008) (quoting *Faibisch v. Univ. of Minn.,* 304 F.3d 797, 803 (8th Cir.2002)).

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed.R.Civ.P. 12(d). In order to address Defendant's claim that the Government is time-barred from bringing this action, the Court necessarily must consider documents outside of the pleadings, because the Government has not alleged in the amended complaint that extensions were granted for the taxes at issue. The Court will therefore convert Defendant's motion for judgment on the pleadings to one for summary judgment.

### A. Timeliness of Assessment

As previously discussed, the record reveals no statute of limitations issue with regard to the 1994, 1995, 1996, or 1997 Form 1040 tax returns, or the 1996 and 1997 employment taxes.

### B. Steps Taken to Perfect Assessments

Defendant argues the Government has failed to set forth the evidence as to the steps that were taken to make the assessments of liability, asserting the Government has only provided summaries of alleged assessments made. Defendant asserts the Government has not set forth how Defendant was notified of the assessments or his right to contest them, and

the amended complaint only refers to a notice and demand for payment of the assessments described but does not provide a copy of any notice sent to Defendant or how notice was accomplished. Defendant argues the amended complaint does not establish the Government took the requisite steps to perfect an assessment of deficiency, and it does not even show proof of signed or affirmed records of assessment by the Secretary of Treasury or a designated agent as required.

The Government argues (1) it is not required to send a deficiency notice to a taxpayer prior to assessing employment taxes, therefore it was not required to notify Defendant of his 1996 and 1997 employment tax deficiencies prior to assessing them, (2) Defendant signed Forms 4549–CG with respect to his 1994 through 1997 income taxes, and by signing those forms, Defendant waived his right to a deficiency notice regarding those taxes, (3) Defendant explicitly chose to waive his right to contest in Tax Court the assessment of those deficiencies and consented to the immediate assessment and collection of them, and (4) the certificates of assessments and payments establish that a proper assessment has been made, contain all of the necessary information, and demonstrate the tax assessments shown on the certificates were properly made.

■ The taxes at issue are Raymond and Letha Porter's income taxes and employment taxes from Porter Livestock. Employment taxes do not require the IRS to send a deficiency notice to the employer-taxpayer prior to making the assessment.

[I]n this case the underlying tax liabilities are for employment taxes, which are not contemplated by IRC §§ 6211 or 6213(a). Both IRC §§ 6211 and 6213(a) specifically apply to any tax imposed by subtitle A (concerning income tax) or subtitle B (concerning estate and gift tax), chapter 41 (public charities), 42 (private foundations and certain other tax-exempt organizations), 43 (qualified pension, etc., plans), or 44 (qualified investment entities). Employment tax liabilities are found under subtitle C, chapters 21 and 24 of the IRC and therefore do not fall under the IRC's definition of "deficiency."

*Henderson v. United States*, 95 F.Supp.2d 995, 1003 n. 22 (E.D.Wis.2000); *see also Cutaiar v. United States*, No. 91–3526, 1992 WL 198927, at *6 (E.D.Pa. Aug. 11, 1992) ("The normal deficiency procedures with respect to assessment of tax are inapplicable since the 100% penalty relates to withholding taxes."). The IRS was not required to send Defendant a deficiency notice prior to assessing the 1996 and 1997 employment taxes.

■ Also at issue are the 1994, 1995, 1996, and 1997 income taxes, which do require the IRS to send a deficiency notice to the taxpayer prior to assessing the taxes.

If the Secretary determines that there is a deficiency in respect of any tax imposed by subtitles A or B or chapter 41, 42, 43, or 44, he is authorized to send notice of such deficiency to the taxpayer by certified mail or registered mail. Such notice shall include a notice to the taxpayer of the taxpayer's right to contact a local office of the taxpayer advocate and the location and phone number of the appropriate office.

26 U.S.C. § 6212(a). A taxpayer may waive the right to a deficiency notice by signing a notice and placing it on file with the Secretary of Treasury. 26 U.S.C. § 6213(d). "A duly executed IRS Form 4549 is a proper waiver of the deficiency notice requirements." *Perez v. United States*, 312 F.3d 191, 197 (5th Cir.2002). Defendant signed a Form 4549–CG on be-

half of himself, and as power of attorney for Letha Porter, for the 1994, 1995, and 1996 income taxes on January 5, 2000. Defendant similarly signed a Form 4549–CG for the 1997 income taxes, although his signature on this form is not dated.[9] Both forms signed by Defendant specifically state, "I give my consent to the immediate assessment and collection of any increase in tax and penalties." Defendant waived his right to a deficiency notice for the 1994, 1995, 1996, and 1997 income taxes when he signed the Form 4549–CGs.

Defendant also argues the Government has failed to set forth the evidence as to the steps that were taken to make the assessments of liability, asserting the Government has only provided summaries of alleged assessments made against the Porter defendants.

The record contains certificates of assessments (IRS Form 4340) for the 1994, 1995, 1996, and 1997 income taxes, and for the quarterly employment taxes for 1996 and 1997. These certificates of assessments establish the taxes at issue were properly assessed.

> An assessment is made "by recording the liability of the taxpayer in the office of the Secretary in accordance with rules or regulations prescribed by the Secretary." I.R.C. § 6203. The IRS satisfies its obligations under this statute when an assessment officer signs a summary record of assessment, describing (1) the taxpayer's name and address; (2) the character of the assessed liability; (3) the taxable period (if any); and (4) the amount of the assessment. Treas. Reg. § 301.6203–1. Contrary to the [taxpayer's] assertion, the Certificates of Assessments and Payments offered by the government in support of its motion for summary judgment meet

the requirements of Treas. Reg. § 301.6203–1, as they contain all of the necessary information. In addition, Certificates of Assessments and Payments establish the fact of assessment and carry with them a presumption of validity and that the assessments they reflect were properly made. *United States v. Chila*, 871 F.2d 1015, 1018 (11th Cir.1989), *cert. denied*, 493 U.S. 975, 110 S.Ct. 498, 107 L.Ed.2d 501 (1989); *United States v. Strebler*, 313 F.2d 402, 403–404 (8th Cir.1963); *United States v. Dixon*, 672 F.Supp. 503, 506 (M.D.Ala.1987), *aff'd without published opinion*, 849 F.2d 1478 (11th Cir.1988).

*Hefti v. Internal Revenue Service*, 8 F.3d 1169, 1172 (7th Cir.1993); *see also Perez*, 312 F.3d at 195 ("IRS Form 4340 constitutes valid evidence of a taxpayer's assessed liabilities and the IRS's notice thereof."). The Court concludes Defendant's argument that the Government has failed to set forth evidence as to the steps that were taken to make the assessments of liability is without merit.

## C. Liens at issue

Defendant argues the amended complaint refers to the filing of notices of tax liens, but does not set forth whether the notices of the filing of tax liens were sent to Defendant, nor provide a copy of any such notices.

"The Secretary shall notify in writing the person described in section 6321 of the filing of a notice of lien under section 6323." 26 U.S.C. § 6320(a)(1). James Driscoll (Driscoll), Supervisory Revenue Officer with the Small Business/Self Employed Operating Division of the Internal Revenue Service, wrote in a sworn declaration that he had reviewed the IRS collec-

---

**9.** On this same form, immediately above Defendant's signature, the signature of IRS Revenue Agent Carolyn Hingst is dated January 10, 2000.

tion records pertaining to Defendant and Porter Livestock. Driscoll indicated that Revenue Officer Kathy Phipps sent Defendant, individually and doing business as Porter Livestock, notices of the federal tax liens for the income tax years 1994 through 1997 and the employment tax years 1996 and 1997 that were filed with the Muscatine County Recorder. Driscoll indicated those notices are dated May 15, 2001, and were sent by certified mail. The record contains copies of these notices. Further, although Defendant attempts to argue he did not receive notices of the federal tax liens, he wrote the IRS a letter asking them to release the tax liens, claiming he had expatriated from the United States. The IRS received the letter from Defendant and treated it as a request for a collection due process hearing and ultimately denied the request to have the liens released.

Defendant also argues the amended complaint does not specify upon which property tax liens were filed. The amended complaint specifically states the Government is entitled to foreclose the tax liens on "any property owned by Raymond R. Porter." Am. Compl. ¶ 17. The amended complaint goes on to specifically detail three parcels of property by their legal description. Am. Compl. ¶¶ 18, 19, 22.

> If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States *upon all property and rights to property, whether real or personal, belonging to such person.*

26 U.S.C. § 6321 (emphasis added). "[T]he lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." *Id.* § 6322. Federal tax liens arose on all property belonging to Defendant at the time the assessments at issue were made and continue in effect.

The Court concludes the Government has set forth sufficient evidence to demonstrate the liens at issue were correctly obtained and executed, and Defendant has failed to produce any evidence to refute the Government's evidence in this regard. The record fails to disclose any genuine issue of material fact exists regarding the liens at issue.

### D. Inclusion of John Russell Porter as a Party

Finally, Defendant argues John Russell Porter is not the holder of an interest in any of the property at issue; therefore, he should be dismissed from this action. The Government asserts it named John Russell Porter as a defendant in this action because of any interest he may have claimed to the property at issue in this case. Because John Russell Porter does not claim an interest, the Government does not oppose Defendant's request to dismiss John Russell Porter from this case. The Court will therefore dismiss John Russell Porter from the case.

### CONCLUSION

For the reasons stated,

The Government's Motion for Summary Judgment (Clerk's No. 34) is **granted in part and denied in part.** The Government's Motion for Summary Judgment (Clerk's No. 34) is **denied,** with the exception that no genuine issue of material fact exists in regard to the 1994, 1995, 1996, and 1997 federal income taxes, as to which the motion is **granted**

Defendant's Motion to Dismiss (Clerk's No. 61) is **denied.**

Defendant's Notice of Failure to Include an Essential Party (Clerk's No. 62) is **denied.**

Defendant's Demand for Jury Trial (Clerk's No. 71) is **denied.**

Defendant's Motion for Judgment on the Pleadings (Clerk's No. 74) is **granted in part and denied in part.** Defendant's Motion for Judgment on the Pleadings (Clerk's No. 74) is **denied,** with the exception that John Russell Porter should be dismissed from the case, as to which the motion is **granted.**

The parties are directed to contact the office of Magistrate Judge Bremer for the purpose of scheduling a status conference, at which time a date for the remaining bench trial will be established and any other pretrial matters addressed.

**IT IS SO ORDERED.**